UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRUCE PECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-10606-JGD |
| CITY OF BOSTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

November 1, 2010

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff, Bruce Peck ("Peck"), makes his living as a street performer. He has brought this action for declaratory and injunctive relief, pursuant to 42 U.S.C. § 1983, claiming that the defendant, City of Boston ("City"), violated his constitutional right to free speech by implementing a policy restricting the area in which street performers may perform their acts at Boston's Faneuil Hall. The matter is before the court on the parties' cross-motions for summary judgment (Docket Nos. 27 and 31). At issue is whether the City's policy imposes unreasonable restrictions on the time, place and manner of street performances at Faneuil Hall, and in particular, whether it is narrowly tailored to address a significant governmental interest and whether it leaves open ample alternative channels for communication. For the reasons detailed below, this court finds that there are

disputed issues of material fact on these issues. Accordingly, both motions for summary judgment are DENIED.

## II.  STATEMENT OF FACTS[1]

The following facts are undisputed unless otherwise indicated.

### Peck's Work as a Street Performer

Plaintiff Peck is a resident of Florida who makes his living as a street performer using the stage name Stephen Chance. (DF ¶¶ 1, 5; PF ¶ 2). Peck has performed in over twenty different countries and has worked as an acrobat, magician, escape artist, balloon twister and human statue. (PF ¶ 2). Street performers typically work in places that have open spaces, a significant number of tourists, and where small crowds are able to gather. (DF ¶ 3). Peck has performed at a number of locations in Boston, which is well-known for street performers. (DF ¶¶ 7, 15). Over the past decade, he has spent multiple summers performing at Faneuil Hall, which is located on publicly owned property in Boston. (PF ¶ 3).

---

[1] The facts are derived from the following materials: (1) the Defendant's Local Rule 56.1 Statement of Facts ("DF") and the exhibits attached thereto ("Def. Ex. __") (Docket No. 29); (2) Plaintiff Bruce Peck's Response to Defendant's Rule 56.1 Statement of Facts ("PR") (Docket 41); (3) the exhibits attached to the Records Declaration of Shane P. Early in Support of Bruce Peck's Opposition to Defendant's Motion for Summary Judgment ("Pl. Ex.__") (Docket No. 42); (4) Bruce Peck's Local Rule 56.1 Statement in Support of His Motion for Summary Judgment ("PF") (Docket No. 34); (5) the exhibits attached to the Records Declaration of Shane P. Early in Support of Bruce Peck's Motion for Summary Judgment ("Pl. Supp. Ex. __") (Docket No. 33); (6) Defendant City of Boston's Local Rule 56.1 Statement of Facts in Support of its Opposition to Motion for Summary Judgment ("DR") (Docket No. 39); (7) the Defendant City of Boston's List of Exhibits ("Def. Supp. Ex. __") (Docket No. 38-1); and (8) the exhibit attached to the Records Declaration of Shane P. Early in Support of Bruce Peck's Reply Memorandum in Support of His Motion for Summary Judgment ("Pl. 2nd Supp. Ex. __") (Docket No. 45).

In 2008, Peck came to Boston and performed at both Faneuil Hall and the New England Aquarium. (DF ¶¶ 6, 8). During the time period from about mid-May 2008 to late July 2008, Peck performed at Faneuil Hall as a living statue known as the "Golden Cowboy." (PF ¶ 4; DF ¶¶ 9, 11-12, 14). Thus, Peck wore a costume, covered himself from head to toe in golden colored makeup, and struck various poses. (PF ¶¶ 5, 7; DR ¶ 7). His audience would leave money in a nearby container. (PF ¶ 7; DR ¶ 7). Peck's golden cowboy performance was completely silent. (Id. ¶ 6).

### Restrictions on Street Performers at Faneuil Hall

In July 2008, the City erected metal barricades around the north, south and east sides of the Faneuil Hall building and established a policy prohibiting street performers from conducting performances outside of a designated area (the "Designated Area") located on the west side of the building in a section of the property known as Dock Square. (See DF ¶¶ 17, 26; PF ¶ 18). The policy went into effect on July 24, 2008, when Boston police officers prevented street performers from setting up in their usual locations and, without regard for the nature of the shows, instructed every performer to conduct his or her performance in the Designated Area. (DF ¶¶ 28-29; PF ¶ 28). The police also informed the street performers, including the plaintiff, that they would be subject to arrest if they left the Designated Area. (DF ¶ 30; PF ¶ 31). In fact, on one occasion when Peck was sitting near Faneuil Hall with his performance gear in a suitcase, City law enforcement personnel threatened to arrest him and impound his equipment if he did not move into the Designated Area. (PF ¶¶ 32-33). Approximately a dozen street performers,

including the plaintiff, were impacted by the policy, which remains in place today. (PF ¶¶ 20, 41).

The parties dispute whether the size of the Designated Area was sufficient to accommodate Peck and all of the other street performers who wished to perform at Faneuil Hall. The City, citing testimony from Stephen Crosby, the Deputy Commissioner of the City's Property Management Department, claims that the Designated Area covers approximately 5,000 square feet of space. (See DF ¶ 27 (citing Def. Ex. C at 64-65); PF ¶ 15). Peck, on the other hand, contends that the Designated Area measures only 15 feet by 15 feet, and that it is too small to allow any more than one or two of the approximately 12 street performers to present their acts at one time. (PR ¶ 27; PF ¶¶ 29, 43; Pl. Ex. 1 at 89, 95-96).

The parties also dispute whether the City's policy on street performers was created solely for the purpose of addressing noise complaints from nearby businesses or whether it was aimed at ensuring safety and security at Faneuil Hall as well. Again, the record contains conflicting evidence on the issue. For instance, Michael Galvin, the Chief of the City's Property Management Department, testified that during the summer of 2008, he received a number of complaints from Faneuil Hall businesses about the level of noise caused by some of the street performers. (See PF ¶¶ 8, 10-11; Pl. Ex. 3 at 33-34). The complaints led to a meeting at which City and law enforcement officials addressed concerns about the street performers and decided to restrict the street performers to the Designated Area. (Pl. Ex. 3 at 33-34; Pl. Ex. 4 at 59). According to Mr. Galvin, who

was present at the meeting, the decision to move street performers into the Designated Area was based "solely" on concerns regarding noise.  (Pl. Ex. 3 at 58-59).

Nevertheless, the record also contains evidence showing that the City's concerns about street performers extended to issues of public safety and building security.  For example but without limitation, Sergeant Daniel Downey, the official in charge of overseeing the City's law enforcement efforts at Faneuil Hall, testified that in 2008, the City was experiencing a number of problems with street performers, including loud noise and incidents of street performers assaulting each other.  (PF ¶ 17; Def. Supp. Ex. E at 34).  Additionally, according to Sergeant Downey, crowds gathering near the east side of the Faneuil Hall building to watch the street performers "would block one or several of the entrances going into either the upper hall or into the shops, making it a dangerous situation for people going in or out of that building."  (Def. Supp. Ex. E at 35; see also Def. Ex. D at 50-51).  Sergeant Downey also stated that the crowd's close proximity to the buildings in that area threatened to harm the physical structures.  (Def. Ex. D at 51).  He testified that the City addressed these problems by erecting metal safety barriers on three sides of the Faneuil Hall building and by moving the street performers to the remaining west side.  (Def. Ex. D at 36).

### Events Following the Establishment of the Designated Area

Following the establishment of the Designated Area, the plaintiff went to City Hall to learn the basis for the City's policy.  (PF ¶ 34).  Peck was sent to several different

municipal departments, but was unable to obtain an explanation for the restrictions on street performers. (See id. ¶¶ 35-36).

Peck also returned to Faneuil Hall periodically in order to see whether the restrictions remained in place. (PF ¶ 39). On July 27, 2008, he attempted to stand in the location where he had previously performed his act. (DF ¶ 37). However, he was surrounded by two police officers and threatened with arrest. (Id. ¶¶ 39-40). Peck was not arrested, but the police prevented him from performing at Faneuil Hall that day. (Id. ¶ 38). Instead, Peck conducted his performance near the New England Aquarium. (Id. ¶ 44).

The plaintiff never performed in the Designated Area. (DF ¶ 32). Rather, due to the continuing restrictions and threats of arrest, Peck made no further attempts to perform at Faneuil Hall. (PF ¶ 38). He claims that he has not returned to Boston to work as a street performer since 2008 because he fears further harassment from law enforcement personnel. (Id. ¶ 40).

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS

#### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c)(2). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado,101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal citations and quotations omitted), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). However, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (quotations and citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

    **B.**    **Municipal Liability Under 42 U.S.C. § 1983 – In General**

Peck is seeking to hold the City liable, pursuant to 42 U.S.C. § 1983, for violating his constitutional right to free speech. In such cases, "[a]ssessing liability against the City requires two basic elements: first, the plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation . . . ." Young v. City of Providence, 404 F.3d 4, 25-26 (1st Cir. 2005). In order to meet the second element, "a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged. This requires that plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989) (internal citation omitted).

In the instant case, the undisputed facts show that Peck stopped performing at Faneuil Hall as a result of the City's policy on street performers. At issue is whether the policy deprived Peck of his right to free speech.

### C.    Alleged Violation of Peck's Right to Free Speech

#### General Principles of Free Speech

"The First Amendment to the United States Constitution proscribes abridgement of 'the freedom of speech . . . or the right of people peaceably to assemble, and to petition the Government for a redress of grievances.'" Coalition to Protest the Democratic Nat'l Convention v. City of Boston, 327 F. Supp. 2d 61, 69 (D. Mass. 2004) (quoting U.S. Const. amend. I), aff'd sub nom. Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8 (1st Cir. 2004). There is no dispute that artistic expression, including acts by street performers, falls within the protection of the First Amendment's free speech guarantee.

See Goldstein v. Town of Nantucket, 477 F. Supp. 606, 608 (D. Mass. 1979) (finding that musician's street performances were "clearly within the scope of protected First Amendment expression"). "However, it is well-settled that the First Amendment does not guarantee unlimited access to government property for expressive purposes." Coalition to Protest the Democratic Nat'l Convention, 327 F. Supp. 2d at 69. Where the government is attempting to regulate speech within a public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753, 105 L. Ed. 2d 661 (1989) (quotations and citations omitted).

In the instant case, the parties agree that the Faneuil Hall area is a traditional public forum, and that the City's policy must satisfy the criteria set forth in Ward in order to pass constitutional muster. (Def. Mem. (Docket No. 28) at 4; Pl. Mem. (Docket No. 32) at 6). See also Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F. Supp. 65, 75 (D. Mass. 1990) (finding that Faneuil Hall Marketplace has characteristics of a public forum and noting that "the entire Faneuil Hall area has long been a center for public debate and expression"). Additionally, Peck does not dispute that the policy at issue in this case applies to all street performers regardless of the content of their acts. (Pl. Mem. at 7 n.6). Therefore, the question whether the

City's policy is constitutional depends on whether it is narrowly tailored to serve a significant government interest and whether it leaves open ample alternative channels of communication. Because the record establishes that there are questions of material fact on these issues, neither party is entitled to summary judgment.

### Narrow Tailoring

"[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" but does not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799, 109 S. Ct. at 2758 (quotations, punctuation and citations omitted). "To satisfy this benchmark, a regulation need not be the least restrictive alternative available to the government." Bl(a)ck Tea Soc'y, 378 F.3d at 12. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800, 109 S. Ct. at 2758. "In short, the 'essence of narrow tailoring' is that the regulation must 'focus[ ] on the source of the evils the [government] seeks to eliminate . . . and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils.'" Coalition to Protest the Democratic Nat'l Convention, 327 F. Supp. 2d at 70 (quoting Ward, 491 U.S. at 800 n.7, 109 S. Ct. 2758 n.7).

In the instant case, disputes about both the government interest at issue and the scope of the restrictions imposed by the City preclude the entry of summary judgment for either party. Thus, Peck argues that the City created the Designated Area due to complaints about noise from certain street performers, and that the policy restricting street performers to the Designated Area is not narrowly tailored because it targets all street performers, including silent performers like Peck, and because the City has the ability to control any noise problems by enforcing its noise ordinance and targeting only those who break the law.[2]  (Pl. Mem. at 7-9). However, as detailed above, there is a disputed issue of fact as to whether the City's policy on street performers was created to address only noise problems or whether it was created to address safety and security issues as well.[3] The maintenance of safety and security is a significant government interest. See McCullen v. Coakley, 571 F.3d 167, 178 (1st Cir. 2009) (finding, in evaluating whether time, place and manner restrictions were narrowly tailored, that government has a substantial interest in enhancing public safety). Therefore, the question whether the City's policy improperly restricts protected speech because it targets all street

---

[2] In his written submissions, Peck challenges as unconstitutional both the City's placement of barricades around three sides of the Faneuil Hall building and its establishment of the Designated Area for street performers. However, at oral argument, the plaintiff's counsel confirmed that Peck is no longer challenging the barricades, and that his only dispute is with the enforcement of the Designated Area.

[3] The City concedes that there is a disputed issue of material fact as to whether the policy on street performers was created for the purpose of addressing noise or whether it also was implemented in order to secure the Faneuil Hall property and ensure public safety. (Def. Opp. Mem. (Docket No. 38) at 3-5).

performers rather than those who make excessive noise cannot be resolved on summary judgment.

The plaintiff contends that even if the City's policy was motivated by safety and security concerns, the defendant's creation of a Designated Area for street performers was not narrowly tailored to promote the City's interests. Specifically, Peck argues that the only safety concerns identified in the record arose out of activities on the east side of the Faneuil Hall building, and that such concerns were eliminated by the City's placement of barricades around the perimeter of the building on the north, south and east sides. (Pl. Reply Mem. (Docket No. 44) at 1-2). Thus, Peck asserts that once the City eliminated street performers' ability to conduct their acts on the east side of the building by placing barricades there, it could not impose further restrictions on street performers by limiting them to a specified area.

Peck's argument is not supported by the record. As an initial matter, the evidence does not compel the conclusion that the City's safety and security concerns were limited to one side of the Faneuil Hall building. Although Sergeant Downey testified that he was concerned with safety issues arising from street performances on the building's east side, he did not rule out the existence of similar concerns elsewhere on the property. (See Def. Supp. Ex. E at 50-51). Therefore, a jury could conclude that some of the same safety issues that Sergeant Downey identified, including potential harm to the building and interference with pedestrian access, would have posed problems on the west side of the building if the City had not created the Designated Area. Furthermore, testimony from

-12-

Mr. Crosby indicates that the City's decision to create a specific area for street performances was based on concerns about safety, security and public access on all four sides of the building.  In particular, Mr. Crosby testified that in creating the Designated Area, the City took into consideration the number of people visiting the property, the number of people using the property, the security of the property itself, the existence of fire lanes around all four sides of the property, and issues of pedestrian access to Faneuil Hall and the surrounding properties.  (See Def. Supp. Ex. D. at 62-64, 74).  Mr. Crosby did not state that the City only considered the impact of these factors on the building's east side.  Therefore, there are disputed facts relating to whether the governmental restrictions needed to address only concerns about events on the east side of the building.

Similarly, there are disputed facts as to whether the Designated Area was an appropriately limited response to the government's concerns.  Mr. Crosby testified that in light of the public safety and security concerns, the most reasonable way to accommodate the people who wanted to use the property was to move some of the activity into the Designated Area.  (Id. at 63-64).  There is sufficient evidence in the record for a jury to conclude that the policy restricting street performers to the Designated Area was designed to promote a significant government interest in the maintenance of safety and security throughout the Faneuil Hall property, and that the City's interests would not have been served as effectively if the defendant had not carved out a specific area for street performers.

Finally, as explained above, the City was not required to choose the least restrictive approach to regulating street performances at Faneuil Hall, as long as its policy did not "burden[ ] *substantially* more speech than necessary" to achieve its interest. McCullen, 571 F.3d at 179. Given the parties' dispute about the size of the Designated Area, and the lack of any information as to the amount of additional space, if any, that could have been made available to street performers without threatening public safety or building security, this court cannot determine as a matter of law whether the City's policy "burden[s] substantially more speech than is necessary to further [its] legitimate interests." Ward, 491 U.S. at 799, 109 S. Ct. at 2758.

### Alternative Channels for Communication

The parties also dispute whether the Designated Area leaves open ample alternative channels for communication. Peck argues that the size of the Designated Area has made performance at Faneuil Hall "essentially impossible," while the City contends that the Designated Area is more than sufficient to accommodate Peck's golden cowboy performance. (See Pl. Opp. Mem. (Docket No. 40) at 6; Def. Opp. Mem. (Docket No. 38) at 6). As both parties concede, any decision on this issue depends upon the resolution of the parties' dispute regarding the size of the Designated Area. (See Def. Opp. Mem. at 5-6; Pl. Reply Mem. at 2). Peck contends that the Designated Area consists of only 225 square feet, and cannot accommodate more than one or two street performers at a time, while the City asserts that Designated Area is substantially larger, covering about 5,000 square feet. (PF ¶¶ 29, 43; DF ¶ 27). According to the plaintiff, his golden cowboy

performance requires no more than about 24-by-24 inches of space. (Def. Supp. Ex. B at 132). He does not dispute that if the City is correct about the size of the Designated Area, it would provide him with ample opportunity to perform his act. (See Pl. Reply Mem. at 2-3). Thus, the question whether the City's policy on street performers leaves open ample alternative avenues of communication involves a disputed issue of material fact that must be presented to a jury.

## IV. CONCLUSION

For all the reasons detailed above, this court finds that there are disputed issues of material fact which preclude summary judgment for either party on Peck's claim that the City's time, place and manner restrictions on street performers at Faneuil Hall have violated his right to free speech. Therefore, both of the parties' motions for summary judgment (Docket Nos. 27 and 31) are DENIED.

                                                   / s / Judith Gail Dein
                                                   Judith Gail Dein
                                                   U.S. Magistrate Judge